## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **ZEPHYRHUB LLC** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **Civil Action No.  2:26-cv-96** |
| | § | |
| **ANKER INNOVATIONS LTD.** | § | **JURY DEMANDED** |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ZephyrHub LLC ("ZephyrHub" or "Plaintiff")[1] files this First Complaint for patent infringement against Anker Innovations Ltd. ("Anker" or "Defendant").  Plaintiff alleges infringement of United States Patent Numbers 9,864,421 ("the '421 Patent") and 9,997,939 ("the '939 Patent"); collectively, the "Asserted Patents."[2]

## PARTIES

1.      Plaintiff ZephyrHub is a limited liability company organized and existing under the laws of the State of Texas having an address at 5900 Balcones Drive, Suite 100, Austin, Texas 78731-4298.

2.      Upon information and belief, Defendant Anker Innovations Ltd. is a corporation organized and existing under the laws of Hong Kong, with a principal place of business located

---

[1] Plaintiff was formerly known as PatentBridge Solutions LLC.

[2] A true copy of the '421 Patent is incorporated by reference herein and may be accessed at http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=9864421 or https://patents.google.com/patent/US9864421B2.  A true copy of the '939 Patent is incorporated by reference herein and may be accessed at http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=9997939 or https://patents.google.com/patent/US9997939B2.

at Room 1318-19, Hollywood Plaza, 610 Nathan Road, Mongkok, Kowloon, Hong Kong SAR, Peoples Republic of China.

3.      Upon information and belief, Defendant does business in the State of Texas and in the Eastern District of Texas. Defendant does not maintain a registered agent for service of process in Texas. Accordingly, Defendant may be served through the Texas Secretary of State under the Texas Long Arm Statute. Alternatively, Defendant may be served through any other means permitted by law.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  Jurisdiction as to these claims is conferred on this Court by 35 U.S.C. §§1331 and 1338(a).

5.      This Court has personal jurisdiction over Anker pursuant to due process and/or the Texas Long Arm Statute because, inter alia, (i) Anker has done and continues to do business in the United States, including in the State of Texas; (ii) Anker has committed and continues to commit acts of patent infringement in the United States, including in the State of Texas, including making, using, offering to sell, and/or selling accused products in the United States and Texas, and/or importing accused products into the United States and Texas, including by Internet sales and sales via retail and wholesale stores, inducing others to commit acts of patent infringement in the United States and Texas, and/or committing at least a portion of any other infringements alleged herein.

6.      In addition, or in the alternative, this Court has personal jurisdiction over Anker pursuant to Fed. R. Civ. P. 4(k)(2).

7.     Venue is proper in this district as to Defendant. Anker is organized under the laws of Hong Kong. 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants."

8.     In addition, Defendant has knowingly induced and continues to knowingly induce infringement within this District by advertising, marketing, offering for sale and/or selling devices containing infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof.

## FACTUAL BACKGROUND

9.     On or about, September 22, 2025, Anker received a letter ("the Notice Letter") from ZephyrHub (under its former name, PatentBridge Solutions LLC), dated September 17, 2025, introducing ZephyrHub, and notifying Anker of seven ZephyrHub patents including the two Asserted Patents, and identifying Anker's "line of hubs (e.g., Anker's models 341, 555, 563, 575, and Anker Prime Charging Docking Station, and other similar models) that contain a DC/DC converter."[3]   In particular, the letter identified United States Patent Nos. 9,864,421 ("the '421 patent"); 9,997,939 ("the '939 patent"); 10,409,757 ("the '757 patent"); 10,673,256 ("the '256 patent"); 10,224,727 ("the '727 patent"); 10,951,055 ("the '055 patent"); 10,574,070 ("the '070 patent").   Thus, Defendant has been aware of the Asserted Patents since, at least, September 22, 2025.

---

[3] Plaintiff's name, as used in the Notice Letter, was "PatentBridge Solutions LLC".  Plaintiff changed its name to ZephyrHub LLC after Defendant's receipt of the Notice Letter and prior to the filing of this Complaint.

10.     The Notice Letter is attached as Ex. A.

11.     The Notice Letter states, in part, "It has come to the attention of PatentBridge that Anker Innovations Ltd. ("Anker") is selling (directly or indirectly), advertising, offering for sale, or importing into the United States devices (e.g., hub or adapter devices) that infringe PatentBridge's patents either directly, or indirectly through the acts of its end-users or intermediaries."

12.     The Notice Letter also states, in part, "By way of example, the '421 patent and '939 patent relate to a hub containing a DC/DC converter and connected to a portable device such as a phone or portable computer. I draw your attention to, for example, claim 1 of the '421 patent and claim 1 of the '939 patent. It has been brought to PatentBridge's attention that Anker sells a line of hubs (e.g., Anker's models 341, 555, 563, 575, and Anker Prime Charging Docking Station, and other similar models) that contain a DC/DC converter and implement other elements of the cited claims, such that they infringe the '421 patent and '939 patent when used by end-users in the normal and customary way of using the hubs (e.g., connecting them to a portable device)"

13.     The Notice Letter specifically identified the Asserted Patents.

14.     The Notice Letter specifically identified Defendant's hub models 341, 555, 563, 575, and Anker Prime Charging Docking Station.

15.     The Notice Letter specifically accused Defendant of infringing the Asserted Patents.

16.     The Notice Letter was received by Defendant on or about September 22, 2025.

17.     The Notice Letter's tracking and delivery confirmation documents are attached as Ex. B.

18.     Defendant had pre-suit knowledge of its infringement of the Asserted Patents.

19.     In addition, Defendant has been aware of the Asserted Patents since, at least, the filing and/or service of the original Complaint in this case.

20.     The accused products are Anker's line of hubs that contain a DC/DC converter including, but not limited to Anker's models 341, 555, 563, 575, and Anker Prime Charging Docking Station, and other similar models (collectively, the "Accused Products").  The Accused Products shall encompass those products identified in Plaintiff's infringement contentions, to be served in accordance with the case scheduling order in this action.

<u>COUNT I</u>

<u>DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 9,986,421</u>

21.     On January 9, 2018, United States Patent No. 9,986,421 entitled "Hub Having Complex Power Converters" was duly and legally issued after full and fair examination. Plaintiff is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '421 Patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US9864421B2/.

22.     Defendant has infringed the '421 Patent.

23.     As stated above, multiple of Defendant's hubs are accused of infringement. Solely for the purposes of satisfying Plaintiff's pleading obligations, Plaintiff explains its theory of infringement for one of the Accused Products in the following paragraphs.  That one exemplary Accused Product is the Anker PowerExpand 7-in-1 USB-C PD, variously known as the Anker 341.

24.     The Accused Product is a hub electrically connecting to electronic equipment and a portable device located in an external environment via a Universal Serial Bus (USB) cable, the USB cable comprising a signal transmission line and a power transmission line.  The back side of the package containing the Accused Product describes this configuration, as follows:[4]





---

[4] The identification or location of components that correspond to claim terms, and the way that the claim terms are used here, is only exemplary, and is only provided to satisfy Plaintiff's pleading obligations.  Plaintiff's infringement allegations will be described in its infringement contentions and infringement expert report in accordance with the case schedule in this action. Plaintiff may add, remove, change, or supplement its infringement theories.  Similarly, Plaintiff may adopt claim construction positions that supersede any apparent or suggestive positions set forth in this Complaint, which is only provided to satisfy Plaintiff's pleading obligations.

PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT                                              6



**Key Features** ✕

**The Anker Advantage**
Join the 65 million+ powered by our leading technology.

**Massive Expansion**
Get way more out of your laptop's USB-C port, with 4K@30Hz HDMI, SD card connectivity, USB-A / USB-C data ports, as well as high-speed pass-through charging with Power Delivery.

**Powerful Pass-Through Charging**
Compatible with USB-C Power Delivery to provide high-speed pass-through charging to your laptop at up to 85W.

**High-Speed, High-Def**
USB-C and USB-A data ports provide file transfer at speeds up to 5 Gbps, while an HDMI port supports media display at resolutions up to 4K@30Hz.

**What You Get**
Anker 341 USB-C Hub (7-in-1) / Premium 7-in-1 USB-C Hub, welcome guide, worry-free 18-month warranty, and friendly customer service.

USB cable

Portable device

Electronic equipment

**Snapshot of usage as shown on the user manual of the product (Source: Anker website at**

**https://service.anker.com/article-description/A8346-Anker-341-USB-C-Hub-7-in-1-User-**

**Manual containing the download link https://salesforce-knowledge-download.s3.us-west-**

**2.amazonaws.com/000008449/en_US/000008449.pdf)**

25.    The Accused Product, in one exemplary infringing configuration, comprises a first connector, electrically connected to the electronic equipment via the USB cable:



**Exemplary Use Of Product Apearing in Product Manual**

The hub comprises a first connector (shown above) that, as shown in the product documentation, is to be electrically connected to the electronic equipment (e.g., the charger) via the USB cable and the hub. The first connector is the end of the USB cable that is directly inserted into the portable device (e.g., the laptop).

26.     The Accused Product, in one exemplary infringing configuration, comprises a second connector, electrically connected to the portable device via the USB cable:



**Exemplary Use Of Product Appearing in Product Manual**

The hub comprises a second connector (shown above) that, as shown in the product documentation, is to be electrically connected to the portable device (e.g., the laptop) via the USB cable and the hub. The second connector is one of the connection ports that is part of the hub, and the portable device (e.g., the laptop shown above) is electrically connected to the second connector via the USB cable and the hub.

27.     The Accused Product comprises a controller, electrically connected between the first connector and the second connector, the controller has data transmission between the portable device and the electronic equipment mutually via the signal transmission line.  The hub comprises a controller (a Via Labs VL162 "USB Type-C Data Switch with CC Function for USB 3.1 Gen 2 (10 Gbps)" controller, snapshot show below) that is electrically connected between the first connector and the second connector. The controller (VL162) facilitates data transmission between the portable device and the electronic equipment mutually via the signal transmission line.

 The key features of the hub, as mentioned on Anker's website, refer to the use of the hub for data transfer between the ports and USB-C. Furthermore, the datasheet of VL162 controller indicates that it facilitates data/signal transmission.

 As per USB type-C PD protocol specifications, if the source (electronic equipment / charger) and the sink (portable device / laptop) are connected, signal transmission occurs between them, e.g., to negotiate on the power required by the laptop and the power that the charger can provide, via single wire (CC). Specifically, in this case, the source (i.e., the charger) advertises its capabilities to the sink (i.e., the laptop), and the laptop signals its requirements to the charger. Based on this signal transmission, voltage and current requirements are negotiated between the charger and the laptop, and then the negotiated power flows from the AC source via the charger to the laptop.

The signal transmission between the source and the sink to negotiate the appropriate voltage and current for charging the laptop occurs via the first connector, the hub (specifically the controller included in the hub), the USB cable, and the second connector.



**VL162 Datasheet**

○   Is the only Port allowed to talk to the Cable Plug(s) at any given time.

### 2.5   SOP* Communication

#### 2.5.1   Introduction

The Start of Packet (or SOP) is used as an addressing scheme to identify whether the Communications were intended for one of the Port Partners (SOP Communication) or one of the Cable Plugs (SOP'/SOP'' Communication). SOP/SOP' and SOP'' are collectively referred to as SOP*.  The term Cable Plug in the SOP'/SOP'' Communication case is used to represent a logical entity in the cable which is capable of PD Communication and which might or might not be physically located in the plug.

The following sections describe how this addressing scheme operates for Port to Port and Port to Cable Plug Communication.

#### 2.5.2   SOP* Collision Avoidance

For all SOP* the Source co-ordinates communication in order to avoid bus collisions by allowing the Sink to initiate messaging when it does not need to communicate itself.  Once an Explicit Contract is in place the Source indicates to the Sink that it can initiate a message sequence.  This sequence can be communication with the Source or with one of the Cable Plugs.  As soon as the Source itself needs to initiate a message sequence this will be indicated to the Sink. The Source then waits for any outstanding Sink SOP* Communication to complete before initiating a message sequence itself.

#### 2.5.3   SOP Communication

SOP Communication is used for Port to Port communication between the Source and the Sink.  SOP Communication is recognized by both Port Partners but not by any intervening Cable Plugs.  SOP Communication takes priority over other SOP* Communications since it is critical to complete power related operations as soon as possible.  Message sequences relating to power are also allowed to interrupt other sequences to ensure that negotiation and control of power is given priority on the bus.

#### 2.5.4   SOP'/SOP'' Communication with Cable Plugs

SOP' Communication is recognized by electronics in one Cable Plug which is the Cable Plug that detected VCONN at Attach (see [USB Type-C 1.2]). SOP' Communication can also be supported when SOP'' Communication is also supported. SOP'' Communication is recognized by the electronics in the Cable Plug that did not detect VCONN at Attach.

The Vconn Source is the DFP/Source at Attach although all of these roles can later be swapped using PD messaging.

SOP' Communication between the Port Partners is not recognized by the Cable Plug.  Figure 2-2 outlines the usage of SOP* Communications between a VCONN Source (DFP/UFP) and the Cable Plugs.

All SOP* Communications take place over a single wire (CC).  This means that the SOP* Communication periods must be coordinated to prevent important communication from being blocked.  For a product which does not recognize SOP/SOP' or SOP'' Packets, this will look like a non-idle channel, leading to missed packets and retries. Communications between the Port Partners take precedence meaning that communications with the Cable Plug can be interrupted, but will not lead to a Soft or Hard Reset.

| USB Power Delivery Specification Revision 3.0, Version 1.1 | Page **51** |

When no Contract or an Implicit Contract is in place (e.g. after a Power Role Swap or Fast Role Swap) the Source (which can be either the DFP or UFP but must also be the VCONN Source) can communicate with a Cable Plug using SOP' Packets in order to discover its characteristics (see Figure 2-2).  During this phase all communication with the Cable Plug is initiated and controlled by the Source which acts to prevent conflicts between SOP* Packets.  The Sink does not communicate with the Cable Plug, even if it is the DFP, and *Discards* any SOP' Packets received.

When an Explicit Contract is in place the VCONN Source (either the DFP or the UFP) can communicate with the Cable Plug(s) using SOP'/SOP'' Packets (see Figure 2-2).  During this phase all communication with the Cable Plug is initiated and controlled by the VCONN Source which acts to prevent conflicts between SOP* Packets.  The Port that is not the VCONN Source does not communicate with the Cable Plug and does not recognize any SOP'/SOP'' Packets received.  Only the DFP, when acting as a VCONN Source, is allowed to send SOP* in order to control the entry and exiting of Modes and to manage Modal Operation.

**Source:  https://e2e.ti.com/cfs-file/__key/communityserver-discussions-components-files/138/USB_5F00_PD_5F00_R3_5F00_0-V1.1-20170112.pdf**

28.     The Accused Product comprises a first direct current (DC)/DC converter, an input terminal of the first DC/DC converter is electrically connected to the electronic equipment via the power transmission line, an output terminal of the first DC/DC converter is electrically connected to the portable device via the power transmission line, the first DC/DC converter is applied to output stable voltage to the portable device.  For example, the Accused Product contains a DC/DC converter (a Genesys Logic, Inc. GL3510 "USB 3.1 Gen 1 Hub Controller", as shown in the snapshot below) that is electrically connected to the electronic equipment via the power transmission line. An output terminal of this DC/DC converter is electrically connected to the portable device via the power transmission line. This DC/DC converter is applied to output stable voltage to the portable device.

The hub performs the function of DC power regulation or control can be inferred from the fact that the hub can input 100W of power and output 85W of power, as shown in the snapshot below. This distribution of power is possible only through a DC/DC converter.

Furthermore, the hub includes GL3510 chip (as shown in the snapshot below) that has an on-chip power regulator, and hence acts as a DC-DC switch/converter.







29.    The first connector (i.e., the end of the USB cable that transfers power from the charger to the laptop via the hub) is USB 3.1 Power Delivery type C port. This is evident from the fact that the GL3510 chip included in the hub is compliant with USB 3.1 specification, as shown in its datasheet snapshot below.



Furthermore, the electronic equipment (i.e., the charger) that is connected to the hub can operate in charged mode or power supply mode via the USB PD protocol.

Specifically, the charger can vary its power supply based on the requirements of the portable device / laptop. The laptop may have a higher power requirement when its battery is getting charged. In this case, the laptop signals to the charger (via the hub) to provide more power to the laptop. This indicates the "power supplying mode" of the charger.

When the laptop is disconnected from the hub, the charger enters an idle or standby mode, where it draws minimal power from the AC source (e.g., to operate the charger's circuitry). This state of the charger can be construed as the "charged mode" of the charger.

Furthermore, when the laptop is connected to the hub and its battery is fully charged, the laptop signals to the charger to supply a minimal amount of power to enable the laptop's operation (but not charge the battery). This mode, where the charger provides minimal amount of power to the laptop, can also be construed as the "charged mode" of the charger.

## COUNT II

### DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 9,997,939

30.    On June 12, 2018, United States Patent No. 9,997,939 entitled "Hub" was duly and legally issued after full and fair examination.  Plaintiff is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent,

including the right to recover for past infringement damages and the right to recover future

royalties, damages, and income.  A true copy of the '939 Patent is incorporated by reference

herein and may be accessed at https://patents.google.com/patent/US9997939B2/.

31.    Defendant has infringed the '939 Patent.

32.    The Accused Product is a hub, electrically connecting to an electronic equipment

and at least a portable device located in external environment via a Universal Serial Bus cable,

the Universal Serial Bus cable comprising a signal transmission line and a power transmission

line.  The product documentation explains that the hub can be used to connect to an electronic

equipment (e.g. a charger). Further, the availability of multiple ports enables connection of a

portable device (e.g., a laptop, a notebook, etc.) located in an external environment via a USB

cable. The USB cable comprises a signal transmission line and a power transmission line. It is

disclosed in the product description that the hub is used for data transfer and power delivery (via

USB type C).









**Unboxed Product**



**Front of Product Package**



**Back of Product Package**





**Snapshots of usage as shown on the user manual of the Product** (Source:
https://d2211byn0pk9fi.cloudfront.net/spree/accessories/attachments/84475/Copy_of_A8346
_Manual_51005001293_20181120_65x90mm_V01%281%29.pdf?1598007026)



**Casing removed from Product (Anker 341)**



**Exemplary Use Depicted as on user manual of the Product**

33.    The Accused Product, in one exemplary infringing configuration, comprises a first connector, electrically connected to the electronic equipment via the Universal Serial Bus cable:



**Exemplary Use Depicted as on user manual of the Product**

The hub comprises a first connector (shown above) that, as shown in the product documentation, is to be electrically connected to the electronic equipment via the Universal serial bus (USB) cable. The first connector is the end of the USB cable that is directly inserted into the portable device (e.g., the laptop).

34.    The Accused Product, in one exemplary infringing configuration, comprises a second connector (shown below) that, as shown in the product documentation, is to be electrically connected to the portable device (e.g., the laptop) via the USB cable and the hub. The second connector is one of the connection ports that is part of the hub, and the portable device (e.g., the laptop shown below) is electrically connected to the second connector via the USB cable and the hub:



**Exemplary Use shown as on User Manual of the Product**

The second connector is communicatively connected to the first connector and electrically connected to the portable device (e.g., the laptop shown above) via the USB cable and the hub's internal circuit. The hub comprises a controller (a Via Labs VL162 "USB Type-C Data Switch with CC Function for USB 3.1 Gen 2 (10 Gbps)" controller, snapshot show below) that is electrically connected between the first connector and the second connector.

35.     The hub also contains a controller, that is configured to provide data transmission between the portable device and the electronic equipment mutually via the signal transmission line, the first connector, and the second connector.  For example, as explained above, the hub comprises a controller (a Via Labs VL162 "USB Type-C Data Switch with CC Function for USB 3.1 Gen 2 (10 Gbps)" controller, snapshot show below) that is electrically connected between the first connector and the second connector.:

The controller (VL162) facilitates data transmission between the portable device and the electronic equipment mutually via the signal transmission line.

The key features of the hub, as mentioned on Anker's website, refer to the use of the hub for data transfer between the ports and USB-C. Furthermore, the datasheet of VL162 controller indicates that it facilitates data/signal transmission.

As per USB type-C PD protocol specifications, if the source (electronic equipment / charger) and the sink (portable device / laptop) are connected, signal transmission occurs between them, e.g., to negotiate on the power required by the laptop and the power that the charger can provide, via single wire (CC). Specifically, in this case, the source (i.e., the charger) advertises its capabilities to the sink (i.e., the laptop), and the laptop signals its requirements to the charger. Based on this signal transmission, voltage and current requirements are negotiated between the charger and the laptop, and then the negotiated power flows from the AC source via the charger to the laptop.

The signal transmission between the source and the sink to negotiate the appropriate voltage and current for charging the laptop occurs via the first connector, the hub (specifically the controller included in the hub), the USB cable, and the second connector.





**Product Feature**

| VL162 |
| --- |
| USB Type-C Data Switch with CC Function for USB 3.1 Gen2 (10 Gbps) |

- ■ 4:2 10Gbps USB Type-C Data Switch
- ■ Support up to 10Gbps
- ■ 2 Differential Channel, 2:1 MUX/DeMUX
- ■ Compatible with 10Gbps USB3.1 Gen2
- ■ Low power consumption with 6mW active at device mode
- ■ High DC common mode voltage supporting to 2.0V
- ■ 28 pins QFN 3.5 x 4.5mm package
- ■ ESD > 2.5kV, CDM > 500V
- ■ Lead(Pb)-Free and RoHS compliant
- ■ MUX / DEMUX
- – Insertion loss: -1.4dB @ 5GHz typ.
  - -1.95dB @ 8GHz typ.
  - -2.25dB @ 10GHz typ.

○ is the only Port allowed to talk to the Cable Plug(s) at any given time.

### 2.5   SOP* Communication

#### 2.5.1   Introduction

The Start of Packet (or SOP) is used as an addressing scheme to identify whether the Communications were intended for one of the Port Partners (SOP Communication) or one of the Cable Plugs (SOP'/SOP'' Communication). SOP/SOP' and SOP'' are collectively referred to as SOP*. The term Cable Plug in the SOP'/SOP'' Communication case is used to represent a logical entity in the cable which is capable of PD Communication and which might or might not be physically located in the plug.

The following sections describe how this addressing scheme operates for Port to Port and Port to Cable Plug Communication.

#### 2.5.2   SOP* Collision Avoidance

For all SOP* the Source co-ordinates communication in order to avoid bus collisions by allowing the Sink to initiate messaging when it does not need to communicate itself. Once an Explicit Contract is in place the Source indicates to the Sink that it can initiate a message sequence. This sequence can be communication with the Source or with one of the Cable Plugs. As soon as the Source itself needs to initiate a message sequence this will be indicated to the Sink. The Source then waits for any outstanding Sink SOP* Communication to complete before initiating a message sequence itself.

#### 2.5.3   SOP Communication

SOP Communication is used for Port to Port communication between the Source and the Sink. SOP Communication is recognized by both Port Partners but not by any intervening Cable Plugs. SOP Communication takes priority over other SOP* Communications since it is critical to complete power related operations as soon as possible. Message sequences relating to power are also allowed to interrupt other sequences to ensure that negotiation and control of power is given priority on the bus.

#### 2.5.4   SOP'/SOP'' Communication with Cable Plugs

SOP' Communication is recognized by electronics in one Cable Plug which is the Cable Plug that detected VCONN at Attach (see *[USB Type-C 1.2]*). SOP'' Communication can also be supported when SOP' Communication is also supported. SOP'' Communication is recognized by the electronics in the Cable Plug that did not detect VCONN at Attach.

The Vconn Source is the DFP/Source at Attach although all of these roles can later be swapped using PD messaging.

SOP Communication between the Port Partners is not recognized by the Cable Plug. Figure 2-2 outlines the usage of SOP* Communications between a VCONN Source (DFP/UFP) and the Cable Plugs.

All SOP* Communications take place over a single wire (CC). This means that the SOP* Communication periods must be coordinated to prevent important communication from being blocked. For a product which does not recognize SOP'/SOP'' or SOP'' Packets, this will look like a non-idle channel, leading to missed packets and retries. Communications between the Port Partners take precedence meaning that communications with the Cable Plug can be interrupted, but will not lead to a Soft or Hard Reset.

When no Contract or an Implicit Contract is in place (e.g. after a Power Role Swap or Fast Role Swap) the Source (which can be either the DFP or UFP but must also be the VCONN Source) can communicate with a Cable Plug using SOP' Packets in order to discover its characteristics (see Figure 2-2). During this phase all communication with the Cable Plug is initiated and controlled by the Source which acts to prevent conflicts between SOP* Packets. The Sink does not communicate with the Cable Plug, even if it is the DFP, and *Discards* any SOP* Packets received.

When an Explicit Contract is in place the VCONN Source (either the DFP or the UFP) can communicate with the Cable Plug(s) using SOP'/SOP'' Packets (see Figure 2-2). During this phase all communication with the Cable Plug is initiated and controlled by the VCONN Source which acts to prevent conflicts between SOP* Packets. The Port that is not the VCONN Source does not communicate with the Cable Plug and does not recognize any SOP'/SOP'' Packets received. Only the DFP, when acting as a VCONN Source, is allowed to send SOP* in order to control the entry and exiting of Modes and to manage Modal Operation.

**Source:   https://e2e.ti.com/cfs-file/__key/communityserver-discussions-components-files/138/USB_5F00_PD_5F00_R3_5F00_0-V1.1-20170112.pdf**

36.    The hub also includes a DC/DC converter (a Genesys Logic, Inc. GL3510 "USB 3.1 Gen 1 Hub Controller", as shown in the snapshot below) that is electrically connected to the electronic equipment via the power transmission line. An output terminal of this DC/DC converter is electrically connected to the portable device via the power transmission line. This DC/DC converter is applied to output stable voltage to the portable device.

The hub performs the function of DC power regulation or control can be inferred from the fact that the hub can input 100W of power and output 85W of power, as shown in the snapshot below. This distribution of power is possible only through a DC/DC converter.

Furthermore, the hub includes GL3510 chip (as shown in the snapshot below) that has an on-chip power regulator, and hence acts as a DC-DC switch/converter.





37.     The first connector (i.e., the end of the USB cable that transfers power from the charger to the laptop via the hub) is USB 3.1 Power Delivery type C port. This is evident from the fact that the GL3510 chip included in the hub is compliant with USB 3.1 specification, as shown in its datasheet snapshot below.





38.     Furthermore, the electronic equipment (i.e., the charger) that is connected to the hub can operate in charged mode or power supply mode via the USB PD protocol.

39.    Specifically, the charger can vary its power supply based on the requirements of the portable device / laptop. The laptop may have a higher power requirement when its battery is getting charged. In this case, the laptop signals to the charger (via the hub) to provide more power to the laptop. This indicates the "power supplying mode" of the charger.

40.    When the laptop is disconnected from the hub, the charger enters an idle or standby mode, where it draws minimal power from the AC source (e.g., to operate the charger's circuitry). This state of the charger can be construed as the "charged mode" of the charger.

41.    Furthermore, when the laptop is connected to the hub and its battery is fully charged, the laptop signals to the charger to supply a minimal amount of power to enable the laptop's operation (but not charge the battery). This mode, where the charger provides minimal amount of power to the laptop, can also be construed as the "charged mode" of the charger.

## ACTS OF INFRINGEMENT

42.    The paragraphs above under the heading "Count I" and "Count II" (collectively, the "Claim Chart Paragraphs") explain in detail how the Asserted Patents are infringed (each, an "Infringing Configuration") when the Accused Product is configured as shown in Claim Chart Paragraphs.

43.    Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, at least claim 1 of the '421 Patent and at least claim 1 of the '939 Patent in violation of 35 U.S.C. § 271(a) by making, using, offering for sale, and/or selling in the United States, and/or importing into the United States without authority or license, the Accused Product.

44.    Alternatively, and in addition, upon information and belief, Defendant has directly infringed, and is continuing to directly infringe, literally or under the doctrine of equivalents, at least claim 1 of the '421 Patent and at least claim 1 of the '939 Patent, by

displaying, demonstrating, configuring, and internally using and testing the Accused Product in infringing configurations in the United States, including in this judicial district, in violation of 35 U.S.C. § 271(a).

45.    Defendant also infringes those claims of the Asserted Patents identified in Plaintiff's infringement contentions, including preliminary, supplemental, and final contentions.

46.    In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), infringement of at least claim 1 of the '421 Patent and at least claim 1 of the '939 Patent by inducing its distributors, customers, subsidiaries, importers, and/or consumers to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the Accused Product.  Defendant's affirmative acts of selling the Accused Products, causing the Accused Products to be sold, advertised, offered for sale, and/or distributed, and providing instructions explaining how to use the Accused Products in Infringing Configurations have induced and continue to induce Defendant's customers, and/or end-users to use the Accused Products in their normal and customary way to infringe the Asserted Patents.

47.    For example, it can be reasonably inferred that end-users will use the infringing products, which will cause the end-users to use the elements that are the subject of the claimed invention.  Defendant specifically intended and was aware that these normal and customary activities would infringe the Asserted Patents.  Defendant specifically intended that end-users use the Accused Product in Infringing Configurations including those cited in the Claim Chart Paragraphs above.  In addition, Defendant provides marketing and/or instructional materials, such as user guides, product packaging, and website content, that specifically teach end-users to use the Accused Products in Infringing Configurations.  By providing such instructions,

Defendant knows (and has known), or was willfully blind to the probability that its actions have, and continue to, actively induce infringement.

48.    Defendant has also established distribution channels for the Accused Product into and within the United States, manufactured the Accused Product in conformity with standards recited in the claims of the Asserted Patents, manufactured the Accused Product in conformity with U.S. laws and regulations, distributed or made available instructions or manuals for the Accused Product to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for the Accused Product to these purchasers in the United States. By way of example only, certain claim terms within the asserted claims of the Asserted Patents contain references to technical standards, e.g., USB-C and aspects of USB-C PD.  Defendant has induced infringement and continues to induce infringement of, in addition to other claims, at least the specific claims identified above of the Asserted Patents by selling in the United States, and continuing to sell after being put on notice of its infringement, without Plaintiff's authority, infringing products and providing instructional materials.  These actions have induced and continue to induce the direct infringement of the Asserted Patents by end-users.  Defendant performed acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the Asserted Patents and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement.  Upon information and belief, Defendant knew of the Asserted Patents and knew of its infringement, including by way of the Notice Letter and service of the original complaint in this lawsuit as described above.

49.    In addition, Defendant contributorily infringes under U.S.C. § 271(c) at least claim 1 of the '421 Patent and at least claim 1 of the '939 Patent.  Defendant knew, or should have known, at least as a result of Plaintiff's Notice Letter to Defendant, or as of the service of

the original Complaint in this action, that third parties, such as end-users, would infringe the Asserted Patents, and with knowledge that the Accused Product is specially designed or adapted to operate in a manner that infringes the Asserted Patents.  The fact that Infringing Configurations are specifically depicted in Defendant's product documentation, as shown in the Claim Chart Paragraphs above, is sufficient to infer that the Accused Product is especially designed to operate in an Infringing Configuration.  On information and belief, the Accused Product has no substantial non-infringing uses.  On information and belief, no substantial non-infringing uses were also depicted on the product documentation, or were not as conspicuously identified.  In addition, the specific and intended functions of the Accused Product are a material part of the inventions of the Asserted Patents, and does not constitute a staple article of commerce suitable for substantial non-infringing use.  The Accused Product is a material part of the inventions of the Asserted Patents in that it provides the central connectivity for all involved devices, i.e., it is a "hub" and as suggested by a hub-and-spoke topology, is the "middle" device in the system.

## **FURTHER ASSERTIONS INVOLVING ALL CLAIMS**

50.     The Asserted Patents are presumed valid under 35 U.S.C. § 282.

51.     The Asserted Patents are valid and enforceable.

52.     Defendant has had knowledge of its infringement of the Asserted Patents as of its receipt of the Notice Letter described above, and alternatively, through service of the original Complaint in this action.  Alternatively, and in addition, on information and belief, Defendant has a policy or practice of not reviewing the patents of others (including instructing its employees to not review the patents of others), and thus has been willfully blind of Plaintiff's patent rights.

53.     Defendant's infringement has been and continues to be willful and deliberate. Upon information and belief, Defendant deliberately infringed the Asserted Patents and acted recklessly and in disregard to the Asserted Patents by making, having made, using, importing, and offering for sale products that infringe the Asserted Patents.  Upon information and belief, the risks of infringement were known to Defendant and/or were so obvious under the circumstances that the infringement risks should have been known.  Upon information and belief, Defendant has no reasonable non-infringement theories.  Upon information and belief, Defendant has not attempted any design/sourcing change to avoid infringement.  Defendant has acted despite an objectively high likelihood that its actions constituted infringement of the Asserted Patents.  In addition, this objectively-defined risk was known or should have been known to Defendant.  Upon information and belief, Defendant has willfully infringed and/or continues to willfully infringe the Asserted Patents.  Defendant exhibited egregious behavior beyond typical infringement in that, despite being aware of its infringement, defendant did not develop any non-infringement theories, did not attempt any design or sourcing change, and did not otherwise cease its infringement.

54.     To the extent any marking or notice was required by 35 U.S.C. § 287, Plaintiff has complied with the applicable marking and/or notice requirements of 35 U.S.C. § 287.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

### PRAYER

WHEREFORE, Plaintiff prays for judgment that:

1. Defendant has infringed and continues to infringe, one or more claims of the Asserted Patents;

2.     Defendant be ordered to pay damages caused to Plaintiff by Defendant's unlawful acts of infringement;

3.     Defendant's acts of infringement have been, and are, willful;

4.     Plaintiff recover actual damages under 35 U.S.C. § 284;

5.     Plaintiff be awarded supplemental damages for any continuing post-verdict infringement up until final judgment;

6.     Plaintiff be awarded a compulsory ongoing royalty;

7.     Plaintiff be awarded an accounting of damages;

8.     Plaintiff be awarded enhanced damages for willful infringement as permitted under the law;

9.     A judgment and order requiring Defendant to pay to Plaintiff pre-judgment and post-judgment interest on the damages awarded, including an award of pre-judgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement by Defendant to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

10.     An award to Plaintiff of the costs of this action and its reasonable attorneys' fees pursuant to 35 U.S.C. §285; and

11.     Such other and further relied as the Court deems just and equitable.

DATED: February 5, 2026          Respectfully submitted,

/s/ *Robert D. Katz*
Robert D. Katz
Texas Bar No. 24057936
KATZ PLLC
8350 N. Central Expressway, Suite 1900
Dallas, TX 75206
214-865-8000
888-231-5775 (fax)
rkatz@katzfirm.com

**ATTORNEY FOR PLAINTIFF**
**ZEPHYRHUB LLC**